We'll hear argument first this morning in Case 14-1146, Tyson Foods v. Bouaphakeo. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. This Court has made clear that class actions are only appropriate when the plaintiff's proof is tailored to their specific theory of liability in a way that allows class-wide injury to be determined in one stroke, and that the lower courts must engage in a rigorous analysis in order to demonstrate that fact. In this Federal Fair Labor Standards Act, the plaintiffs were allowed to pursue a class of more than 3,300 employees who occupied more than 400 jobs, which required widely differing amounts of time to perform their donning, doffing, and washing tasks. Well, is that so? Because as far as I understand this, there was some donning and doffing that was common. That is, there was some sanitation and some protective gear that they all had to wear. And then there was a difference between the knife-wielders and the others, but they weren't all that different. So in one case, one wore mesh aprons, in the other case, rubber aprons. It didn't seem to be that wide disparity. Well, there are a number of answers to that, Justice Ginsburg. First of all, if you just look at the activities that Dr. Mericol specifically testified about, for certain activities, he found some employees who take 30 seconds to get dressed and others who took more than 10 minutes to get dressed in certain circumstances, or 2 versus 13. Kennedy, you didn't have a statistical mechanism of your own, you didn't have a Daubert objection to the testimony, and you suggest in your brief that uninjured plaintiffs are included in aggravate damages, but you were the one that objected to a bifurcated trial. And so far as uninjured plaintiffs recovering, that has to be determined on remand anyway. I just don't understand your arguments. There are a number of questions embedded in there, Justice Kennedy. The first one is, we objected all along to having this class certified on the basis that there were a wide range of active cases. You have also other defenses, your own expert, Daubert objections, et cetera. Justice Kennedy, we don't have to bring forward an expert. What we did in this case is we cross-examined both their name plaintiffs, the four name plaintiffs who testified, and demonstrated two things about that. One, that in general they way overestimated their own time, and two, none of their times were remotely the same as Dr. Mericol's time. So we proved that. Second, we cross-examined Dr. Mericol about his testimony and demonstrated, again, that his methods were completely haphazard and scattered, and therefore couldn't demonstrate. And this notion that you patch over the entirety of these problems simply by averaging all of the times of all of these employees is simply the kind of shortcut this Court has rejected in the past in both Comcast and Walmart. I'm sorry, Justice Sotomayor. Sotomayor, I'm completely at a loss as to what you're complaining about. That's exactly what you did. And what this expert did, I mean, as far as I could tell, between your expert that you used to calculate gang time and K time, did exactly the same thing this expert did. You came out with a lower number, but you used fewer people. At least their expert used hundreds of people instead of the few that you did. I'm just completely at a loss. Would you suggest that if one plaintiff came into court, that he could not use the this expert to prove his case circumstantially, to show that, in fact, the average is this, and he doesn't really know how much time he took? When he does it now, it may be 12 minutes instead of 10? Justice Sotomayor, I would, yes, I would categorically reject that, because that's no more different than Employee A coming into court and saying, I don't know what I worked, but Employee B, who does vastly different activities. Sotomayor, but they know what they worked. They know that people were working over 40 hours, because there were time records with respect to that. What you're basically saying is that Mount Clemens is completely wrong. You can't estimate your time when the employer doesn't keep records. We don't have any quarrel with Mount Clemens the way it was written. Mount Clemens makes a very clear divide between what needs to be proven, what the plaintiff's burden is to demonstrate that he or she has worked beyond the 40-hour work week, and then what happens if that's true? Sotomayor, there were time records to that effect here. Right. But there were a lot of people who didn't work beyond the 40-hour work week. Yeah. There were 200-and-something-odd people that their expert showed didn't work above 40 hours. The jury knew about those 200-odd people. And the jury rejected Dr. Miracle's averaging of 18-and-a-half and 21 minutes. And we don't know what the impact of that is. What we do know is that Fox calculated that a mere 3-minute departure from Miracle's numbers dropped the damages award by $1.4 million and dropped the number of plaintiffs out by close to 125. So, Justice Kennedy, small differences make a big difference in this particular case. Ginsburg. Can we go back to Justice Sotomayor's basic question, that is, when the government sued Tyson, or Tyson's predecessor, and got an injunction, what Tyson's did, it had its own industrial engineer, observed the workers as they were donning and doffing their year, and that expert averaged the times that they spent. And it seems to me that the plaintiff's expert here is doing exactly the same thing that Tyson's expert did when the government was bringing the experts. And in some ways, Justice Ginsburg, that explains why we didn't bring the Daubert motion that Justice Kennedy asked about, because the methodology isn't inherently flawed. The problem with the methodology is it's applied to the theory of liability in this case. It's one thing for an employer to say, look, we're entitled under the Department of Labor regulations to average as a mechanism for trying to avoid the kind of picayune details and discrepancies that the Court identified in Mount Clemens and said those can be disregarded as mere trifles. We're allowed to do that. And the effect of what we, in fact, did here was to round up, in order to provide more time to people than they might otherwise have gotten. And, indeed, if you go to the pre-2007 period, when you're talking about the people who just put on the normal sanitary clothing, they were all given four minutes of K-time, when they — it took them all about 30 seconds to do that. So the idea that we could overcompensate somebody using those kinds of data is one thing. But that's a vast difference from saying that in order to maintain, under a rigorous analysis, the idea that this can proceed as a class, when all you've got is averaging across the widest imaginable range of employees performing different tasks with different requirements. And, indeed, although I don't think I would— Kagan. Kagan. Mr. Phillips, you say the question is whether it can proceed as a class. But it seems as though that's really not the question in this case, because of Mount Clemens, that what Mount Clemens does is to suggest that certain kinds of statistical evidence are completely appropriate in FLSA cases generally, even if they're brought by the government or even if they're brought by a single person. And so the question that you really are putting before us is not a Rule 23 question. It's a question of whether this sort of evidence complies with the Mount Clemens standard. Isn't that right? Phillips, I would go — I would actually go at it the other way. I would say that the first question is, can you use this kind of averaging in a run-mine case, period, under Rule 23? And it seems to me the answer to that has to be no, that this simply papers over the problems of the class. But the inquiry, Mr. Phillips, is always dependent on what the substantive law is. Right. And then the question is — That was true in Halliburton, where we said, look, if we didn't have the basic presumption, we would think of this as very individualized. Right. But we have the basic presumption, so the proof is not individualized. And the same thing, it seems to me, is true here because of the Mount Clemens inquiry, where it says if the employer hasn't kept the appropriate records, even a single plaintiff can prove the amount of work done through the use of statistical evidence. That's not what Mount Clemens says, Justice Kagan. Mount Clemens says that it's the burden on the employee to demonstrate that he or she worked the requisite hours in order to get past 40. Once you got past 40 in determining exactly what the damages would be, at that point it was reasonable, because we hadn't — because Mount Clemens hadn't maintained the requisite records, to go ahead and give the plaintiff a pass. It's the same — it's the Story Parchment test all over again. I can't see how that account of Mount Clemens would make much sense. You're suggesting that a person past 40 can produce the statistical evidence, but if I worked 39 and a half hours and all of this overtime is going to push me over 40, the Mount Clemens presumption wouldn't be available to me? Well, I think that's exactly the line the Court drew in Mount Clemens. It's the line that the Court has consistently drawn in antitrust cases from Parchment tests. Kennedy, you changed your theory. Question 2, as you presented in the petition for certiorari, whether the class may be certified if it had members who are not injured. Then you changed that. Page 49 of your brief, you say that the plaintiff must demonstrate a mechanism to show that. So now you're talking about the mechanism. So the case has been argued on different theories at many points, and it seems to me, Justice Kagan, is precisely right. You said, well, I want to start first with class action. She said, no, no. The point is we start with Mount Clemens. That's the substantive law for FSLA. To be sure — well, I mean, you can go at it either way. But at the end of the day, obviously, what — as I started — as I started my remarks  on the basis of the substantive liability that they have to — burden that they have to assume. Breyer, so Mount Clemens says exactly this. I'll read it. I think it's correct. Where an employee's records of time work are, quote, inaccurate or inadequate — that's your case, right? — then the employee attempting to bring a claim can show time work by producing sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. That's what it says to do. And then it says the employer can't complain that the damages lack the exactness and precision of measurement that would be possible had he kept records, but he didn't. So they used some statistics to show it. What's wrong with that? You said it can't be trusted. There are two answers to that. The premise of the first part of that sentence is if he proves that he has in fact performed work for which he was improperly compensated, none of these employees — a huge number of these employees have not made that showing. Breyer, well, they did through statistics. I mean, you say an antitrust case. Okay. Let's imagine an antitrust case. There's an agreement among sneaker manufacturers to use shoddy material, and large customers, distributors buy these shoddy materials. They're hurt. How much are they hurt? It depends on how many sneakers their employees used and when and so forth. There is no way. People don't keep sneaker records, so what we do is we hire a statistician to use sampling, and if he's a good statistician and uses sampling correctly, we have probably a better measure than if we asked the employees to go back and remember how many sneakers they wore and what days and what hours 50 years ago. But, Justice Breyer, your entire hypothetical is premised on the fact that they had already shown that they were injured in the first instance. Some of them it might turn out. Actually, did not wear sneakers during the period of time that the conspiracy has been shown to exist, though we didn't know that at the beginning because we thought we could prove a conspiracy from January to December, but we only ended up proving it from January until June. Now, there we have it. We put them in the class to begin with because we thought we could prove injury. As it turns out, we can't. Now, I've never heard that you had to be able to know exactly how you're going to win your case when you form the class action, because you don't know quite what the proof will be. I mean, isn't that how class actions work? No. Why not? Phillipson, No, because there's a continuing – I mean, the class certification decision is still open until the final – until a final judgment is rendered by the district court. So the district court has a continuing responsibility in the face of challenges to the class certification to consider decertifying the class, and we raise the question And we raised that issue right after Wal-Mart came along. Breyer, Why decertify the class? If we've shown, or we do show, the conspiracy lasted from January until June, not through December, some people will recover, other people will not recover. Can't we wait until the evidence is presented before we tell the people who didn't? By the sneaker's end, you don't recover? The problem with this, and this would raise exactly the same Comcast problem, is my guess is your expert testified about the conspiracy that lasted through the entire period. And for whatever reason, the jury rejected it, just as it rejected Miracle in this case. And now you're stuck in a situation where you've got this huge judgment where we knew there were 200 and some people who – but we now know there are more than 1,000 plaintiffs. And, Justice Kennedy, we didn't shift the question – the answer. Our answer was this is invalid because there are so many plaintiffs who are – Sotomayor, I have difficulty understanding your point. There are records, aren't there, of how many hours they worked without donning and doffing the equipment at issue, correct? Yes, there are. All right. So I thought that Dr. Merkles, using those actual records, figured out how many people worked over 40 hours. But only because – she didn't do that to say who's over 40. I mean, she obviously identified some who weren't. But she took Miracle's average numbers, 18-and-a-half and 21, and slotted them in when nobody worked 18-and-a-half and 21 minutes. Sotomayor, you didn't have an expert to say that. We didn't need an expert to say that. We had our industrial engineer who said, and the Federal government's industrial engineer, said the same thing for 4 minutes. Is there any way at this point to determine which employees were actually injured and which ones were not, because I gather, because the jury rejected the full verdict that was requested by the plaintiffs, they did not accept Dr. Miracle's testimony regarding the amount of time needed to don and doff for employees in various categories. And without knowing that, I don't see how you can at this point – I'll ask Mr. Frederick the same question – how you can separate the employees who were injured from the employees who were not injured. It's impossible to do that, and Fox, who was their expert who testified on the damages, was very clear about that, because it's not linear, so that if it turns out that some period of time drops, the number of employees who fall below the 40-hour threshold plus the KCO time will drop precipitously. But the briefs are like two ships passing in the night on this point. Is the Respondent going to say this is for remand, or am I wrong about that? I would be shocked if he's prepared to accept a remand. I mean, I'm delighted if he wants that. Kennedy, but aren't there further proceedings? Aren't there further proceedings in this case? Ginsburg, it was a lump-sum. Phillips, it was a lump-sum judgment, Your Honor. Kagan, well, and now that has to be distributed. So there are going to be further proceedings to distribute that lump-sum judgment. Phillips, it is far from clear how it's going to be dealt with at this point, other than on a pro-rata basis, that's what Judge Sotomayor said. Kennedy, but that has to be determined in the trial court. Phillips, I'm sorry? Kennedy, but that has to be determined in the trial court. It's far from clear what the trial court is going to do. The trial court has any intention to do anything with this other than accept the check. Scalia, I don't understand, Mr. Phillips. You can get a class certified, some of whom have not been injured at all, and wait until the conclusion of the trial for the trial court to determine who has not been injured? Well, you can't do that, and the truth of it is, I mean, no, the answer to that is no, and second, you couldn't do it anyway. You can't unscramble this egg at this point. It's impossible. You've got to do it. Well, you conceded that the initial certification was okay, because at that time we didn't know which ones. Well, I wouldn't say we conceded that. I mean, obviously, we filed an opposition to their motion to certify, and we brought forth dozens of supervisors who testified about the myriad jobs and the wide range of donning and doffing requirements for them, and said that under the circumstances this is not an appropriate case to proceed as a class. But didn't you say that in general a class could be certified? Going in, even though at that point we don't know. No. No. I mean, in general we say classes can be certified. I mean, I think you could have certified a walking-time class in this case. Breyer, I'm still having the same problem. When I heard Justice Scalia's question, I thought the answer is, of course, you can put in your class people whom it will turn out are not hurt. I have a class of people who were hurt by a price-fixing conspiracy that lasted from January to December. That's what I said. I have good reason to think it. But I prove it only lasted until June. That's a failure of proof. Half of them were not hurt. Okay? So we don't pay them. I thought that's the most common thing in the world. Am I wrong? It is not? Yes, you are, Justice Breyer, because the problem there is the expert who testified to the conspiracy would have assumed that the conspiracy covered the entire time of the proof. And therefore, the damages number that that expert will put forward will be a vastly larger number than what the jury comes back in based on the finding that there was a shorter conspiracy. Yes. And there's no way to know who was injured in that context and who was not injured in that context. You can't identify the people to pay. Mr. Phillips, there is a way. Sotomayor? Why do you have why do you have standing? I mean, the jury obviously rejected something. It obviously was told to exclude people who were not entitled, and it did it. You didn't object to the failure to have you objected to proposing interrogatories. So this is invited errors. It sounds like invited error. But finally, how do you have standing? Respondent didn't raise that. To argue that the issue of who gets part of that money? Phillips Petroleum says we clearly have standing to do that. Why? Because our concern is that we that that the class be bound by whatever judgment comes out of this. And if it turns out that this class has been improperly treated so that there are a substantial number of plaintiffs. Sotomayor? Let me, except for those people who opted out, there are people who opted in? The Fair Labor Standards Act people opted in, yes, Your Honor. Opted in. So you know all of the people who are bound, all the people who were who opted in. No, no. So why do you have to know whether there can't be more? No, no, no, no. It's quite possible that there are people who have been who have been undercompensated because of this particular scheme and who could claim that because they weren't allowed to participate, their due process rights were violated. They were allowed to participate, they just didn't opt in. Well, others, but others didn't, I mean, that's true, but the bottom line here remains the same, which is they are absent class members whose interests were, may have not been fully protected. And the only question there is do we have standing to raise this issue, which we do. I've never heard of a case where absent class members somehow are bound by a judgment in this case when they didn't opt in. I hope that, I thought that was the whole purpose of not opting in, so you are now bound by this judgment. If it's a class judgment and you didn't opt out, I mean, there are two different classes here, right? There is a 23b3 class and there is the FLSA collective action, which have now been merged in in the judgment. So there is no reason to look at this as anything other than a 23b3 class of individuals and, you know, so that means there are literally thousands of absent class members who are either entitled to or not entitled to damages without any ability to know whether they were or were not injured. And therefore, under those circumstances, what this Court said in Phillips Petroleum is that the defendant has a right to be sure that the mechanism by which the judgment ultimately is entered across the entire class is such that it protects us as a collective or as a collateral estoppel. Roberts Mr. Phillips, do you have a theory as to why the jury awarded less than half of the damages that were requested? Did they – I take it they didn't identify particular workers. Phillips They did not identify particular workers. Roberts Did they disagree with the 18 minutes, 21 minutes? Phillips They had to have disagreed with it, and there was good reason to do that, because if you take the testimony of the four named plaintiffs, they were significantly different than the 18 and 21-minute times, and so the best evidence was, is that Miracle, by this method of sort of nonrandom observations of self-selected employees, came up with wildly extravagant numbers, and the jury rejected them. And it was the plaintiff's decision to go for the entirety of the claim rather than take a more narrow approach of maybe seeking walking time, where the conduct of the The problem with this is that it's very – it's a vast – I'm sorry. Kagan If I could go back to Justice Kennedy's question at the start, because it really was your decision not to have a bifurcated proceeding, where it would have been clear it would have been proved separately in a highly ministerial way which employees worked over 40 hours. And having made that decision, you're in a position now where you're saying, oh, there's one lump judgment, we don't know what to do with it. But in essence, what's going to happen is that it's going to go back in remand, and the judge is going to do something that looks an awful lot like the bifurcation that you rejected, which is, the Court will say, now we figure out in this highly ministerial way who worked more than 40 hours, and so who's entitled to share in the judgment. The bifurcation that the plaintiffs proposed, two things to say about that. First of all, they took it off the table themselves, not us. We did object, but that wasn't rejected because we objected to it. They pulled bifurcation off the table. So I don't think you can put that burden on us. But second of all, the bifurcation they proposed was that first you were going to decide whether Miracle is right or not, and that means whether 18 and a half and 21 can be averaged across your class. And then the second part was going to be Fox testifying about how to slot that in. Well, that's not going to help. It may help with respect to the uninjured, to the injured class members, but it would not have remotely helped with the more fundamental question of the inadequacy of this as a class action device, where you patch over the problems of this class by simply averaging everything together. Kagan.            Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. And it absolutely helps for that. It takes care of the entire problem. That leaves you with only your first question presented, which is this question about was the class too varied. And on that, I have to go back to this to this issue of, it's not a class issue. It's an FLSA issue under Mount Clemens as to whether this kind of statistical evidence could have been presented. And my answer to the Mount Clemens one, which obviously I'm not persuading you on, is that the way I read Mount Clemens, it says you don't go to fair and reasonable inference on the liability phase. You only do that on the damages phase. And I would still argue here that even if you use Mount, the fair and reasonable inference standard, it won't be satisfied by what Miracle did here, because it's one thing to do some kind of sampling. It's another thing to say I'm going to take wildly different 30 seconds versus 10 minutes and average everybody across the plant without any effort to be more tailored in our approach than that, Your Honors. I'd like to reserve the balance. Roberts. Thank you, counsel. Mr. Frederick. Thank you, Mr. Chief Justice, and may it please the Court. Let me start with your question, Justice Kennedy, because there absolutely will be remand proceedings on the presumption that you affirm the judgment of the Eighth Circuit so that the money can be allocated. And we know the names of every single person who would be entitled to an award based on a very long spreadsheet that Dr. Fox compiled in conjunction with Dr. Miracle's analysis. And so you're right, Justice Kagan, that there is a pot of money based on the jury verdict that will be allocated, assuming that the Court affirms the class certification judgment. Well, there's no question the money can be divided up. The question is whether it can be divided up between those who were actually injured and those who were not actually injured. So suppose you have three employees. One worked, one was given credit for working 39 hours a week, one was given credit for working 38 hours a week, one was given credit for working 37 hours a week. Without knowing how much additional time each employee is entitled to, you can't tell which one of those, which, if any of them, was injured. And you can't tell how much additional time the employees were entitled to without knowing what the jury did with Dr. Miracle's statistics. So that's why I don't see how this can be done, other than a very slapdash fashion. Well, there are two ways, and I would submit that they neither is slapdash. Ordinarily, we would defer to jury verdicts and we would say that if the jury evaluated the evidence within the realm of what was presented at trial, that's going to get special deference in our legal system. And so when those monies get allocated, ordinarily a district judge is going to do so on a basis either of pro rata for all of those plaintiffs who were found to be injured, and the 212 were identified by name by Dr. Fox. Tyson knew about them before trial, did not move for summary judgment as to those 212, could have easily severed them right out before this case went to the jury. The second way is that Dr. Fox did an analysis using Miracle's averages and then added them to the number of minutes worked by the particular employee. And so based on that, a vast number got above the 40-hour threshold. Now, the evidence at trial that it came in by Tyson's own witnesses was that the average worker worked 48 hours per week before you even got to any of the counting of the Donning and Dauphin. And that the plant rants on Saturdays 60 percent of the time, which would be a 6-day work week. And so the evidence as the jury was considering it found the vast majority of the class members were already going to be in overtime status, and that's why the fulcrum of the case came down to whether putting on this gear, which was standard sanitary gear for every single worker in the class, was compensable or not. Roberts We don't know why the jury reduced the requested damages by the gave less than half. I mean, it could have been because they thought the evidence on the ones who just put on smocks or whatever, as opposed to the ones who had mesh armor, they said, I don't believe what you said about the ones who don't put on the mesh armor. So we're going to give zero dollars on that. But I believe the validity of the expert's testimony on the ones who put on the mesh armor. So we're going to award that. Or maybe they thought, you know, they would just discount the whole thing or maybe you know, we don't know why. So because they used average statistics over varying jobs with even your expert admitted, varying times, depending upon the classes, there's no way to tell whether everybody who's going to get money was injured or not. Well, and Tyson had an opportunity to ask for more specific instructions. In fact, their instructions were the ones that ended up governing the trial. So to the extent that they had a complaint, they could have asked for more. Roberts Well, do you have, I understand that, but do you have a more substantive answer? Because it's one thing for us to write an opinion saying this is a horrible problem, but they didn't ask for instructions, so don't worry about it. It's another thing, we need to know whether we should address the mechanism by which this was presented to the jury, and then we can deal separately with the waiver issue. Yeah. Well, on the substantive part, Mr. Chief Justice, let me say this, that in all of these cases, whether it's a challenge between an aggregation or something where you could ask the jury for a more particularized decision, there's always a tactical and a strategic decision that the counsel on both sides are making and the parties on both sides. Roberts That sounds like the same answer you gave before. Is there a substantive? Because, yes, we could say, okay, the problem is they didn't ask for a special verdict, they didn't divide it between the people who were engaged in different functions than the killers, stunners, and so on. Substantively, the way this is handled typically is that you would do a pro rata distribution of the jury proceeds to the members who are found to have been injured. That's the substantive answer. We have a different way. Breyer No, but I'm actually puzzled by the same thing, so put yourself in my puzzlement. There is a green room, a yellow room, and a blue room, all right? Now, we discover with our statistical experts that in the green room, doffing and donning of those people on average, some more, some less, but the sampling shows it's half an hour. In the blue room, it's 20 minutes. In the yellow room, it's 10 minutes. So we add those three numbers on to green room, yellow room, and blue room people, and we get a number. Now, that number in individual cases will be wrong, but that's what averaging is about. And if there is no other proof in the case, well, is that good enough? Frederick Well, let me address that question in this way, because I do want to say that's a substantive issue. I think it is not. Breyer Okay. Then skip it. Frederick Because we had additional information and testimony, and Mr. Chief Justice, on the variations, I think it's important to take into account what actually is going on with these Dr. Miracle observations about the 30 seconds versus the 10 minutes. What Dr. Miracle observed using the videotape in the men's locker room was that some of the men put their gear on in the locker room, and then they went down to the line. That might take them 10 minutes to do. Some of the men put on part of the equipment, and then they carried the rest, and they put it on while they were walking to the production line or while they were on the production line itself, and they were not counting. Roberts And I suppose some of them like to chat while they're putting on the equipment and others are more down to, you know, let's get this on as quickly as possible. And some of them have different sorts of jobs that require different sorts of equipment. Frederick And that's what the district court rejected. The district court said there was not evidence to support that, that the equipment wasn't. Roberts There was not evidence to support that they'd have different equipment that they put on? Frederick It was minimal. What the district court and what the court of appeals found was that the differences in equipment were minimal and that they would not drive the difference. And what Dr. Miracle testified, and this is at 346 to 350 of the joint appendix, he explained that the donning and doffing was occurring in different places and that what they argued about this 30-second to 10-minute difference was, in fact, not an accurate depiction of the actual time that it took, because the time clustered around the average. That was his testimony. And that if you took into account the fact that they might be doing it in different places, you then see why averaging works. And the reason averaging works is because the workers were rotating among different assignments. Some of them might start the day in a non-knife capacity, and so putting on all their protective gear before they started their shift didn't make sense. They would carry it to the production line. They'd be pulled off the production line, told you're going to be in a knife capacity, get your gear on. They would put their gear on at that time. So when Dr. Miracle is observing in the locker room how long it takes for people to put their gear on and take it off, he's not counting, he's not taking into account the variations in the work style mandated by the company. Roberts. So your submission is that, in fact, well, what about 18 and 21? You must have thought there was some difference. Well, they were walking to a different part and they were divided into they did have additional equipment in that one, but we divided them by departments and we can identify the employees in the two different departments. Roberts. So the variation that is at least troubles some of us, 30 seconds, 10 minutes, you're saying it's not because the 30-second person is actually going to spend 9 and a half minutes at the end of the walk, and the 10-minute person spent all the time at the beginning of the walk, and there's no difference between the people who clean up and the people who actually slaughter the hogs because the clean-up people are going to slaughter the hogs at 4 hours at the end of the shift and the other. There was rotation among, and their own witness testified to that effect. That's at JA-236. He said they rotated quite frequently, and what he was explaining was that you might start on a particular assignment and Dr. Miracle is taking a 2-day snapshot, right? He's looking at video. And the workers themselves were testifying that the actual donning and doffing basically clustered around the average. That's what Dr. Miracle observed. Roberts Again, there's a basic issue that's presented, but you're saying in addition to avoiding it because of the objection, there's a lack of objections at all, we should not be reaching the substantive issue because, in fact, there was no variation in the time. That's what both courts below found. And so when you are based with a factual record here that comes up here with both courts below, the ordinary presumption, particularly in a jury context, is you're going to interpret the facts in the light most supportive of the sustainable objection. Kennedy Is it an argument that if the employer wants to be quite conscientious about complying with FLSA, the employer has to take some averages? It has to say, we're going to give X minutes for donning and doffing on this line. And the second part of that question is, how much of this case turns on the fact that the employer did not keep adequate records? Well, had this – had the employer kept records, this would be a completely easy case for class certification purposes, because every single issue would be done by common proof. Kennedy Can the employer be charged with not keeping adequate records by not following every single person, every part of that person's day? You spend 4 hours on this line, 4 hours on that line, and you have to put on a certain kind of doffing. Can the employer really keep records for every single employee? It's actually simpler than that, Justice Kennedy. It's where you place the time clock. Had they put the punch clock right outside the locker room so that the workers, as soon as they went in the locker room, punched in, this problem would have been eliminated. Because at that point, when they were putting on the protective gear, the sanitary gear, and then they are walking, and the walking is uniform for all class members, the sanitary gear is uniform for all class workers. So when they're putting on their equipment in the locker room, if they punched in, the company has satisfied the FLSA, and this problem goes away, and then the question is, is the walking and donning and doffing going to work? And that's what the trial was all about. Scalia, many workers put on gear other than sanitary gear. What you say is true. The sanitary gear is the same for all workers. But some of them wear, what, chain mail to protect them from the knives, right? And some of them wear other protective gear. And that's what is claimed to create the discrepancy. Frederick, but if you take the sanitary gear, I'm just saying, if you view from the question of commonality and predominance, which I'm trying to address the first question, the sanitary gear is all the same for everybody, the walking is all the same for everybody, and then the question is, can you use averaging because of the peculiarities of the fact that the doffing of this, basically the same gear, was occurring in three different places, in the locker room, walking down to the production line, and on the production line itself. Scalia I don't think your friend will agree that it's basically the same gear. Frederick, I think that's his point, that it's quite different gear. Frederick, but what the district court found, and they didn't show the – look, we're talking about a difference between a Kevlar belly guard and a plexiglass belly guard or a mesh, metal mesh belly guard. We're talking about the basic same kinds of gear. We're talking about different kinds of gloves. But those variations were presented to the jury, they're found to be minor, and the district court concluded that they were minor differences. Scalia The difference – the question is not whether they're – whether one protective gear is different from another, but it's whether protective gear is different from sanitary gear. That's the question. Frederick, the question is – Ginsburg For all of the workers, there was certain basic equipment. There was basic sanitary gear, but there was also basic protective gear. So the only difference comes up with the protective gear for the knife weld. Frederick, but the basic protective gear was the same for everybody. Frederick, and the knife issue was still – Roberts What was that basic protective gear that everybody – Ginsburg Hard hats, earplugs, or earmuffs, and boots. Frederick, what was it? Frederick, let's see if you remember what she said. What was it? Frederick, hard hats, earplugs, hairnets, beard nets, and basic smocks. Roberts, and boots. Frederick, and boots. I'm sorry, I forgot about this. Roberts, but the knife wielders had a lot more than that. Frederick, right. But the point was, Mr. Chief Justice, that if you were on knife duty at a particular point in time, you were going to rotate frequently during the course of a day or from one day to the next. And so you were charged always to have your gear ready to be put on if you were put in a knife-wielding capacity. Kennedy It seems to me that you might concede that if this were simply a class action under 23, that these problems might be a barrier to certification, but that under Mount  Is that what you're saying? Is that correct? Do you concede that there is a strong possibility that you might not have this class certified under Section 20, under Rule 23, absent Mount Clemens? Frederick, well, Justice Kennedy, I think Mount Clemens answers the question in this case. I think that given the way the evidence came in, the averages here are reasonable ones. So even if there was not a special Mount Clemens rule where there's a burden-shifting framework, the answer should be the same. Breyer So that's exactly, perhaps, what I read the question, the first question. I'm taking it literally. It said whether differences among individual class members may be ignored, okay, where liability and damages will be determined with statistical techniques that assume everyone is like the average. I thought the answer to that question is yes. And it depends, of course, you have to be reasonable. I mean, that's why I used the four rooms. We don't know everybody in the room. What we do is we take an average in the room. If it's a good statistical average, why not? Now, I want to don't want you to agree with that if that isn't the law, but I don't see why it isn't. Frederick, well, Justice Breyer, we do agree with that position, but we also agree with Justice Kennedy that because of the Mount Clemens framework overlay for Fair Labor Standards Act, this is an easier case than a case in which there was not that substantive law difference. Because if you were to take one individual and you were to use the same evidence, it would be representative proof, you would have the same burden-shifting framework. That's why all these arguments about Dr. Miracle really are merits questions. They are not class-certifying questions. Sotomayor, I'm not sure that you've answered the two substantive questions that I see my colleagues asking, okay? With respect to whether you're a knife-wheeler or not, if you're assigned to bear a knife during the day, you're going to be paid for that time anyway, because you're on the start-to-end day, okay? So you're not going to get FSLA for that. So it's only the people who start out the day being required to don those outfits. Frederick, well, actually, Justice Sotomayor, that's where I would disagree with you. Sotomayor, all right. If the worker, through habit, convenience, is doffing while walking, our study didn't double count. Our study only took into account the walking time. So he's not going to get credit for the fact that he's doing work by putting on the gear while he happens to be walking. If he is pulled off the line during gang time while the hogs are going along, he does not get extra minutes because the supervisor says, we need you with knife, so go put your gear on. He's counted as part of gang time at that point. And so ---- Alito, could I just ask you to clarify something before your time runs out, because it's unclear to me from what you've said in your argument. Why did Dr. Miracle come up with one figure for employees on the processing floor and another figure for employees on the slaughter floor if, as I understand you to have said this morning, all of the employees basically do both of those tasks and spend an equal amount of time on them so they can all be considered together? I didn't say that, and if I did, I was ---- I misspoke. Well, that was the impression I got from what you said. Within the department, they would perform different tasks, some of which would require knife and some of which didn't. And it was within the department that the averages that were being observed, we believe are fair averages in light of the fact that we're looking back in time and we're trying to recreate what happened in a three-year period that, you know, was where there are no records. And so within the department, what the court found was that there was consistency and that the differences were minimal. The reason why there's a 3-minute difference is because one is longer, it's a longer distance for walking to get to it, and there is, you know, more to be done. But I want to make clear that we broke this down into the two different departments because we could discern those. But I would submit that the ---- Kennedy, but let me ask you this. If the Court is writing an opinion of reaching the result you want, what is the standard we put? Representative evidence, average evidence of injury is sufficient if. What do we write? I think what you write, Justice Kennedy, is that in this context, where there was an increase in injury averages, and that based on observations where the work activity, the donning and doffing that is contested here, is occurring in three different places, it's fair to treat the employers because the FLSA is a remedial statute that is designed to protect workers who can't keep these kinds of records. That's why ---- Kennedy, that's a little bit too specific for the broad standard that I'm looking for. An average is possible if, what, there's no other way to do it, if it's an FSLA case and has a special policy? Neither of those seem quite satisfactory to me. Well, I think every case is going to be different, as we would all candidly recognize. And an antitrust case is going to be different from a labor case, and that will be different from ---- I think you do have to look at the substantive context in which the averaging is going to occur, so that any deviations at least are explicable here.  And that doesn't seem to have happened here. When the jury comes in with less than half of what the averaging would have produced, how can we say that there's been averaging? The averaging, I think you should infer from the jury's award of damages to the injured, and it was instructed not to give damages to the uninjured workers, and it's faithfully charged with that. The fact that it awards a lesser amount may be based on its own doubts about the number of minutes or the quantity, but those kinds of calculations, I submit, Justice Scalia, we have always deferred to juries in the way these kinds of damages are calculated. Roberts Thank you, counsel. Ms. Prelligar. Prelligar Mr. Chief Justice, and may it please the Court. Justice Kennedy, I'd like to begin with your question about the proper standard to apply here. The government thinks it's the standard that the jury was instructed on, and this appears at JA 471 to 472. The jury was told in this case that they could only rely on representative evidence if all of the employees performed substantially similar activities, and that substantial similarity is what we think is the proper standard to determine whether an inference here would be just and reasonable. Roberts Do you think how do you know they relied on the representative evidence? The number was more than 50 percent of what was asked. The expert was cross-examined. We don't know, for example, if they rejected the 18 minutes but accepted the 21 minutes. The fact that the jury did not give you the damages sought seems to me to call into question the significance of the statistics. Prelligar Well, I think it calls into question whether the jury agreed with the actual time estimates, but I don't think it undermines the conclusion that they found that there was proper representative evidence here, because they were instructed that they couldn't award a recovery to the class and to all of the non-testifying employees unless they were convinced that they all performed substantially similar activities. So I think we have to infer that the jury found that all of these activities were similar, that there were not material differences of the kind that Mr. Phillips has referred to today, because the jury was instructed that that was the only way they could award class-wide to find a finding here of class-wide liability. Roberts Well, but they saw the evidence on which the calculations were based, right? Prelligar That's correct. Roberts They saw the donning and doffing of the sanitary gear and the protective gear. Couldn't they have made judgments based on those actual differences to reject some of the representative statistics? Prelligar I don't think they would have had any basis to do so. And at the end of the jury instruction on representative evidence, which was an instruction that Tyson requested, the jury was told, quote, ''The representative evidence as a whole must demonstrate that the class is entitled to recover.'' And I think that there was an ample evidentiary basis here for the jury to conclude that there weren't substantial dissimilarity among the tasks that were being performed in these donning and doffing activities. It's useful, I think, to review that record evidence. For example, Dr. Miracle testified that the times clustered around the averages. He had 744 videotaped observations. As well, there was the testimony that employees frequently rotated between positions, including between those jobs that used a knife and those that didn't. The employees who testified at trial had times that came in very close to Dr. Miracle's averages. And I'll just refer you to Mr. Loven, who testified at JA 260 and 265, 17 to 19 minutes. Mr. Balderas said 18 to 22 minutes. Mr. Montes said around 20 minutes. As well, Tyson itself apparently didn't think that there were these material variations when it was calculating the K-code time using a study that was very similar to the study that Dr. Miracle employed here and used essentially the same methodology. In that circumstance, Tyson thought that it would be appropriate to treat all employees in a uniform way. So I think it's critical here that we have a jury determination upon a proper instruction about representative evidence that there weren't these kinds of dissimilarities that would warrant. Roberts. Maybe you don't know because you're in an amicus posture, but was the person who normally is, like, hosing down the floor paid as much as the person who performs the most intricate knifing operation? No. My understanding is that there were differences in what you were paid, depending on your position. And yet, you're – both you and your friend are telling me that, well, we shouldn't treat those jobs differently because they often switch back and forth. Well, the jury concluded here that those jobs didn't require materially different gear. So I think that the pay rate, which was evident from Tyson's own records here and could be calculated through these kind of mechanical damages calculations, doesn't signal that there was different gear. It might signal that the work being performed on the job was somewhat different and required different levels of skill. But I think it's clear, based on the jury verdict in this case, that the plaintiffs were able to prove their claim with class-wide evidence. And at this juncture, it's something of the reverse of what this Court has confronted in other cases, where the Court has recognized that sometimes the certification decision overlaps with the merits of the claim, and you have to consider at the outset  Do you concede that if this were a Rule 23 action and the FSLA were not involved, that it would be a much closer, much more difficult case? Yes, I think it would be much closer. And here, I think that this really gets at the point that the dispute here doesn't turn on a freestanding Rule 23 requirement. It turns on the Mount Clemens standard. And Mount Clemens does adopt a special rule tailored to the fact that there is a record-keeping violation in this case that prevents the employees from being able to prove their claims with more precise evidence. We think You agree it would be an extension of Mount Clemens to apply it at the liability stage as opposed to the damages stage, right? I think there's a way to read Mount Clemens where the this, where it would not be an extension. But to the extent that you think it would be, we think it's a perfectly logical one, and one that's consistent with the rationale in Mount Clemens. Mount Clemens said that when the record-keeping violation prevents a determination of the amount of time spent on these activities, then you should be able to come forward with a just and reasonable inference and not put the burden on the employees to prove that time with precision. And when that exact same fact is relevant to liability, insofar as it's necessary to prove that the employee is pushed over the 40-hour-a-week threshold, then we think that all of the rationales that animated Mount Clemens would equally apply to the determination of that particular fact in that context. But we think that Mount Clemens itself signaled that this might be an appropriate determination at the liability phase, because it recognized at the outset that the burden of proving that you have performed work for which you were not properly compensated shouldn't be an impossible burden. That was the language that was used in the opinion. And so I think that whether or not Mount Clemens decided it, certainly it's true that it should be applied in this context to the particular fact that was relevant there. Sotomayor, I'm going to try to phrase what I understand the question my colleagues have been posing, but I don't think either counsel has sort of gotten that, or maybe it's so obvious that we're missing it, okay? Clearly, the expert here, Dr. Joy, said, I'm using a hypothetical, there's 10 minutes of overtime, and the figure that comes out with 10 minutes of overtime is $1 million. Now the jury comes back with half a million dollars. How do you know that what they said is, I half the time, 5 minutes, or the jury said, I think it's 8 minutes for slaughterhouse and 3 for production line people, so it averages out to 5 now, okay? How do we know how the jury calculated that half a million? The answer is that we don't know for sure, Justice Sotomayor. Sotomayor, that's what my colleagues are saying. So the question is, your adversary is claiming that there might be some people on the 3-minute side who are going to come and collect a pro rata share who really weren't injured, because they had worked 39 hours and 57, 56 minutes, something like that. So why is it that it's fair to distribute this award pro rata? Well, I think that it's not clear yet exactly how the award will be allocated, and those will be left to the district court's discretion when the case returns for allocation. At that point, Tyson can come in and it can make these arguments if it thinks it's unfair. The district court will be well positioned to determine whether Tyson waived the claims by actually asking for a lump sum verdict here, and whether Tyson even has a stake in this issue, given that its own liability won't increase. Why would Tyson's care? They have to pay the same amount of dollars. Exactly, Justice Ginsburg, and I think that that shows that Tyson might not have the requisite stake here to be able to challenge the allocation. But I think the overarching point to keep in mind is that the issues with allocating this award were not the inevitable result of the class action mechanism. They don't reveal some defect in that mechanism. There were any number of ways to account for this problem. The trial could have been bifurcated between liability and damages, as Justice Kagan noted. That would have solved this problem entirely, but Tyson opposed it. Or Tyson could have sought judgment against the 212 class members who had no right to recover under the plaintiff's evidence. It didn't do that. Tyson could have asked for a special verdict that would have allocated the damages by the jury, but instead it asked for a lump sum verdict. Or it could have asked for the class definition to be altered in this case to exclude those individuals who weren't working the requisite number of times. Ultimately, there are any number of mechanisms that could account for this issue, and none of them demonstrate that this class action was improper. They went unutilized only because of Tyson's own litigation strategy here. Ginsburg. What happened to the government's action? I mean, the government started this against Tyson or its predecessor and got an injunction, and then the government said that the solution that the cave, whatever it was, that it was clear that you had to pay for actual time worked, and, of course, the Secretary has limited resources and can't conduct enforcement actions for every violation of the FLSA, but it is the Department of Labor's position here that Tyson was in violation of the FLSA, both by not keeping the actual records and by not fully compensating  What do you think an employer should do about record-keeping when the employer believes that certain activities need not be counted under the FLSA? So is the employer, it may be that the employer is stuck with the choice that it makes, the legal judgment it makes, but is it supposed to keep two sets of records so the amount of time that it thinks the employee is entitled to compensation for and then this additional amount of time that it might be argued that the employee is entitled to compensation for? Well, Mount Clemens does make clear that the employer is stuck with its mistake, because it said even when the failure to keep records grows out of a bona fide mistake about whether the time should be compensable, whether it was work, that still the burden-shifting framework applies. But I would also note here that I think there was no legitimate argument here that this wasn't work. These activities, I think it was clear in the wake of Alvarez, were required to be compensated. Thank you, counsel. Mr. Phillips, you have five minutes. Thank you, Mr. Chief Justice. Let me answer Justice Alito's point and the observation here where, I mean, the reality is, is that in the Reich litigation we were told that the ordinary sanitary equipment was not within the donning and doffing requirements and never a problem. And so as a consequence of that, frankly, we didn't monitor this. That's not a complete defense, but it at least explains the sort of the equities of the situation. Second, my good friend tells you that the district court here found that all of these things are very similar. The reality is, is that at PEDAP 87A, the first time this issue came up with the certification, the district court said there are some very big factual differences among all of these employees. And the only reason the district court didn't agree to certify it at that time was because he thought that the gang time was somehow the tie that binds this all together. Well, the gang time was nothing in this litigation. And the reality is he made a mistake then, and every time we came back to decertify this class based on more and more information about the inadequacies of miracles evidence as applied by Fox, it was essentially just wiped away saying, well, this is distinguishable from the Supreme Court's cases here and it's distinguishable from the Supreme Court's cases there. Justice Kennedy, the answer to your question. Scalia, you're saying that the district court made a finding that there were great dissimilarities. Yes, Your Honor, it did. Where is that? That's on page 87A of the appendix to the petition, that's in the first certification decision. Justice Kennedy, the answer to your question about how do you write an opinion and when is it close enough, averaging is a permissible way of going about it when the evidence is clear that the basic activity is homogenous. And that would have been true for walking time. There was literally no difference. Basic activity is homogenous. And here, when you're talking about 30 seconds and 10 minutes and we're talking about wildly different activities, what you can't do is just simply say, okay, we're just going to patch over all of that and average it. Didn't they use a standardized walking time? That's what I thought they used. Yes, and that's why we could put it. There's a standardized walking time because some people are faster than others, correct? Right, but my point here is, is that in general everybody agrees that that's a reasonable way to proceed. That's my point. Here, we're not talking about homogenized because there are vast differences and the evidence is absolutely unassailable on that. And with respect to Mount Clemens, in the first place, I don't think Mount Clemens should be extended to make the fair and reasonable inference standard or the presumption apply at the liability phase. And I think the Court was extremely clear in not wanting to go down that path. But second, even if you thought the presumption should be applied here, I would argue that the miracles evidence as, you know, through cross-examination and examination of others, demonstrates that this is not a fair and reasonable inference. And on that score, it seems to me there are two quotations I'd offer up. One comes from this Court's decision in Wal-Mart. When an expert's testimony does nothing to advance a party's case, the Court can safely disregard what he says. And then what Judge Posner said in a very similar FLSA case, what cannot support an inference about the work time of thousands of employees is evidence of a small, unrepresentative sample of them. And that is precisely what we have in this particular case. The – with respect to remand, we'd be happy for a remand for allocation if that's permissible, but as I read, the final judgment of the district court is judgment of about $6 million to these named plaintiffs, and that was affirmed. There's nothing in there about how this is going to be allocated under these circumstances. So if the Court believes there's got to be a separate proceeding of allocation, the Court hopefully would order that, although I think there's a more fundamental decision the Court would have to reach. And then finally, with respect to who has the burden of dealing with this problem, it is the plaintiff's burden to sustain the justification for a class all throughout the proceedings until a final judgment is entered. And we came to the Court four times asking them not to certify this. So to come back in at the end and say, well, since we were able to try this without any ability to put forward any of our individual defenses with respect to any of these individual employees except for the four who actually testified, is exactly what this Court said in Walmart and Comcast is an impermissible way to define the class. The Court should reverse in this case, declare the class decertified. If there are no further questions, Your Honor, thank you. Thank you, counsel. Case is submitted.